Death Opinion






 

 






IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,060






QUINTIN PHILLIPPE JONES, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM TARRANT COUNTY






 Cochran, J., delivered the opinion of the Court, joined by Meyers, Price,
Hervey and Holcomb, JJ. Keller, P.J., joined by Keasler, J., filed a concurring
opinion. Womack, J., joined by Johnson, J., filed a dissenting opinion.


O P I N I O N




 Appellant was convicted in February 2001 of capital murder. Tex. Penal Code
Ann. §19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas
Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced
appellant to death. Art. 37.071 §2(g). (1) Direct appeal to this Court is automatic. Art.
37.071 § 2(h). Appellant raises sixteen points of error. We affirm. 

I. Miranda violation claim.

 In his first point of error, appellant claims the trial court erred by admitting into
evidence at punishment a written confession taken in connection with an extraneous
offense. Appellant claims that the statement was taken in violation of Miranda v. Arizona (2)
because he was not informed of his rights until the written statement was prepared pursuant
to appellant's oral statements and appellant was about to sign it. We agree.

A. The evidence at the guilt-innocence stage.

 We begin with a summary of the evidence. The victim was appellant's eighty-three-year-old great-aunt, Berthena Bryant. Despite her income of less than $500.00 a month,
Bryant occasionally made small loans to various people, including appellant, and she kept a
ledger recording the loans and their repayments. On September 10, 1999, Bryant told her
sister, Mattie Long, that she had refused appellant's request for a loan earlier in the day. 
Long testified that Bryant seemed uneasy about her conversation with appellant. The next
morning, Bryant's body was discovered in her home by neighbors. A bloody, broken
baseball bat was recovered at the scene. Bryant's car was located a half mile from her
house and her purse and wallet were found in the car. The medical examiner, Dan
Konzelman, testified to the existence of defensive bruising on Bryant's wrists and arms. 
Konzelman also described Bryant's various abrasions, bruises, and fractures, which
included a broken collarbone and shoulder blade, two fractured ribs, and a fracture at the
base of the skull. 

 Appellant was arrested for outstanding traffic warrants and for possession of a
controlled substance on the same day that Bryant's body was discovered. While in custody,
appellant was questioned twice about Bryant's murder by Detective Ann Gates. The first
interview took place on the day he was arrested. Gates read appellant his Miranda warnings
when she noticed that appellant had no reaction to the news of Bryant's death. Appellant
gave a statement denying any involvement in Bryant's murder and claiming an alibi. The
next day, after being informed of his rights again, appellant accompanied Gates to various
locations in an effort to corroborate his alibi. That same day he took a polygraph
examination. 

 When appellant's alibi information did not check out and the polygraph indicated
deception, Gates interviewed appellant a second time. Gates again read appellant his
Miranda rights, appellant agreed to waive them, and appellant gave a second written
statement (the "Gates statement"). In the Gates statement appellant stated that he had
"another personality" named James who lived in his head. He stated that James had started
living in his head since age ten or eleven when he was molested by his brother and cousin.
Appellant stated that James went to Bryant's house to steal some money. After Bryant let
him in and James could not find her purse, appellant stated that James lost his temper and
started hitting Bryant with a bat she kept by the door. After that, James found Bryant's
purse and left in Bryant's car. Appellant stated there was $30.00 in Bryant's purse. 
Appellant then went to a friend's house and bought drugs with the money. He later left
Bryant's car in a parking lot. Appellant does not object to the admission of the Gates
statement.

B. The written statement concerning extraneous murders admitted at the
punishment stage.


 Appellant's complaint is directed at the admission of statements he made to Texas
Ranger Lane Akin nine or ten days later in which he implicated himself in two extraneous
murders that were introduced at the punishment phase of his trial. Texas Ranger Richard
Johnson testified at the suppression hearing that he investigated the homicides of Marc
Sanders and Clark Peoples. Sanders' and Peoples' bodies were both found in the Trinity
River in Wise County in the first week of June, 1999. Based on a lead from appellant's
sister Keisha Jones, Johnson and Akin obtained a search warrant for appellant's residence,
which was executed in the early morning hours of September 22, 1999. 

 Akin left during that search to meet with appellant at the Tarrant County Jail,
together with a Tarrant County Sheriff's deputy, in the early hours of the morning. Akin
informed appellant that he was investigating the murders of Sanders and Peoples. Appellant
admitted having known the victims, but denied any involvement in their murders. Akin then
asked appellant what he would say if "they" (meaning Akin and his fellow investigators) told
him that they had already talked to appellant's good friend, Ricky "Red" Roosa, and that Red
had told them that appellant was the "bad guy," primarily responsible for the murders. At
that point, appellant orally admitted his involvement in the two murders. As appellant
confessed and described details of the offense, Akin wrote down "verbatim" what appellant
said on a statement form, asking questions and transcribing the answers as they went along. 
The entire interview lasted about an hour-and-a-half. When appellant finished his story,
Akin got up, sat down next to appellant, and went over the legal rights that appeared at the
top of the written form. Then Akin and appellant read the statement together and appellant
corrected mistakes, initialed revisions, and signed the statement at the bottom. Appellant's
written statement (the "Akin statement") appears in the Appendix to this opinion. 

C. The failure to Mirandize appellant before interrogating him led to constitutional

 error in the admission of his written statement at trial. 


 Appellant argues that Akin's failure to inform him of his rights at the outset of the
interrogation violated his Fifth Amendment rights as protected by Miranda and that this
violation was not harmless. The State argues that, even though appellant was not warned
until after he made his oral statement, under Oregon v. Elstad, (3) appellant's receipt of the
required warnings before signing the Akin statement rendered it voluntary and admissible. 

 In Miranda, the United States Supreme Court was unequivocal in holding that an
accused, held in custody, must be given the required warnings "prior to questioning." (4) A
failure to do so results in forfeiture of the use of any statement obtained during that
interrogation by the prosecution during its case-in-chief. (5) 

 As the State points out, the failure to comply with Miranda during a custodial
interrogation does not necessarily taint all subsequent confessions. In Elstad, the 18-year-old defendant was implicated in the burglary of a friend's family home in which $150,000
worth of art and furnishings were taken. (6) Two local officers were dispatched to the
defendant's home with an arrest warrant. They found the defendant partially dressed in his
room. They asked him to dress and accompany them to the living room. One of the
officers asked the defendant's mother to step into the kitchen where he informed her that
they had a warrant for her son's arrest for the burglary of a neighbor's home. The other
officer waited with the defendant in the living room. The officer who remained with the
defendant in the living room later testified:

 I sat down with Mr. Elstad and I asked him if he was aware of why Detective
McAllister and myself were there to talk with him. He stated no, he had no
idea why we were there. I then asked him if he knew a person by the name of
Gross, and he said yes, he did, and also added that he heard that there was a
robbery at the Gross house. And at that point I told Mr. Elstad that I felt he
was involved in that, and he looked at me and stated, 'Yes, I was there.' (7)


 After Elstad was taken to the police station and advised of his Miranda rights, he indicated
he wanted to visit with the officers. He then gave a full statement describing his
involvement in the burglary. (8) At trial, Elstad moved to suppress the oral statement ("I was
there") and the written statement, claiming the oral statement made in response to
questioning at his house "let the cat out of the bag" and tainted the later written confession
as "fruit of the poisonous tree." (9) 

 The Supreme Court held that while Elstad's unwarned statement made at his home
must be suppressed, the alleged "fruit" of a noncoercive violation might not be suppressed
if it was given voluntarily. (10) A failure to give Miranda warnings where there has not been
any actual coercion or circumstances calculated to undermine the suspect's ability to
exercise his free will does not so taint the process that a later voluntary and informed
waiver will not be effective. (11) The relevant inquiry is whether the later, properly warned
statement was voluntarily made. "As in any such inquiry, the finder of fact must examine
the surrounding circumstances and the entire course of police conduct with respect to the
suspect in evaluating the voluntariness of" a subsequent warned statement. (12) 

 Examining "the surrounding circumstances and the entire course of police conduct
with respect to [appellant] in evaluating the voluntariness" of appellant's written statement,
we cannot place the Akin statement in the same category as the written statement at issue in
Elstad. (13) In Elstad, the unwarned oral statement was elicited almost inadvertently. The Supreme Court noted that the brief stop in the living room was not for
the purpose of interrogating the suspect, but was to notify the suspect's mother of the
reason for the arrest. (14) The Court also suggested that the failure to give the Miranda
warnings may have been either the result of confusion about whether the suspect was yet in
custody or a desire to avoid what would appear to be an alarming police procedure before
the officers had informed the suspect's mother about his arrest. (15) 

 By contrast, the circumstances in the instant case reflect, at the very least, a serious
misunderstanding by law enforcement, not about whether appellant was in custody, but of
the dictates of Miranda. (16)
 Further, in contrast to Elstad where the initial unwarned
statement took place at the defendant's home and the warned statement was given after
transporting the defendant to the police station, the unwarned and warned statements in this
case were given during a nearly undifferentiated single event, taking place in the same room
as an uninterrupted and continuous process. The written Akin statement was literally a
transcription of appellant's unwarned oral statements. Appellant did not make a second
statement after he finally received his Miranda warnings; he simply signed the written
statement that he had dictated to Akin before he was warned. To apply Elstad here and
declare the Akin statement admissible by virtue of the late admonishment of the required
warnings would undermine the spirit and intent of Miranda. (17) The waiver of rights given in
connection with the Akin statement was not constitutionally valid in light of the
circumstances and entire course of police conduct.

 The State argues that giving appellant his Miranda warnings after he had verbally
confessed but immediately before signing the written statement was constitutionally
adequate under this Court's opinions in Dowthitt v. State (18) and Allridge v. State. (19) In
Dowthitt, as here, the defendant objected to the admission of a statement he made in which
the required warnings were not given before the interrogation but were given before the
defendant signed the written statement. (20) We rejected the defendant's claim, stating that
"[b]ecause a written statement is not 'obtained' (because it is not admissible) until it is
signed, giving the required warnings before the accused signs the statement meets the
statutory requirements." (21) Dowthitt was based on Article 38.22 alone; this Court's
discussion centered solely on the defendant's interpretation of the statute and explicitly
"assum[ed] the federal constitutional requirements in Miranda were met." (22) Allridge,
relied upon by the Court in Dowthitt, was also based solely on Article 38.22. (23) The
discussion of Article 38.22 in those cases does not apply to a claim that a defendant's
federal constitutional Miranda rights have been violated.

 The State also argues that a defendant is not necessarily "in custody" solely because
he is questioned while incarcerated. The State cites cases from several jurisdictions which
have held that there must be a change in the inmate's surroundings or an added imposition
on his freedom of movement before he is "in custody" for Miranda purposes. (24) Appellant
was incarcerated in the Tarrant County Jail under suspicion for capital murder when he was
transported to another part of the jail in the early hours of the morning to meet Ranger Akin
and another officer. He was taken to a small (approximately 8' x 12') interview room to
meet with two officers who informed him that they were investigating the Sanders and
Peoples murders. After five or ten minutes, Akin asked appellant what he would think if
"they" had been told by appellant's good friend "Red" that appellant had the "primary
responsibility" and was the "bad guy" in the two murders. This was a classic police
"interrogation" environment. Under these circumstances, appellant was clearly in custody
for purposes of Miranda when he gave the Akin statement. (25) Thus, the Akin statement,
taken in violation of the Fifth Amendment, should not have been admitted at the punishment
phase of appellant's trial. (26)

D. This constitutional error was harmless beyond a reasonable doubt.

 The final question is whether appellant was harmed by the constitutional violation. (27) 
Reversal is required unless we can determine, beyond a reasonable doubt, that the failure to
suppress the Akin statement did not contribute to the jury's verdict at the sentencing
phase. (28) If there is a reasonable likelihood that the error materially affected the jury's
deliberations, the error was not harmless. (29) The reviewing court should "calculate, as nearly
as possible, the probable impact of the error on the jury in light of the other evidence." (30) 

 We focus upon the probable impact that admission of this statement had upon the
punishment phase. Had the Akin statement concerned the capital murder offense for which
appellant was charged or had it been admitted during the guilt-innocence stage, this Court
would be hard-pressed indeed to find it harmless error. However, the fact that the
statement was offered only during the punishment stage does affect our analysis because, at
the punishment stage of a capital murder trial, the issue is not whether appellant did or did
not commit the Sanders and Peoples murders. Instead, the special issues are predictive and
normative: 1) would appellant probably commit future criminal acts of violence that would
constitute a continuing threat to society; and 2) whether, taking into consideration all of the
evidence, there are sufficient mitigating circumstances to warrant a life sentence rather
than a death sentence. (31) The harmless error rule "'promotes public respect for the criminal
process by focusing on the underlying fairness of the trial rather than on the virtually
inevitable presence of immaterial error.'" (32) Thus, we focus upon the impact that this error
might have had upon the jurors' consideration of those special issues.

 In conducting this analysis in the context of a Miranda error, we must "judge the
magnitude of the error in light of the evidence as a whole to determine the degree of
prejudice to the defendant resulting from that error." (33)

 Therefore, we must assess the probable weight a juror would place upon the
improperly admitted statement. To do this, we assess the independent proof of appellant's
participation in the extraneous murders. (34) The State established appellant's involvement in
the Sanders and Peoples murders by several sources independent of the Akin statement,
including the testimony of John Williams, Keisha Jones, the defense expert Dr. Finn, and
the State's expert, Dr. Price.

 John Williams testified that appellant had dated Williams' mother, Paula Freeman,
since Williams was nine years old and that appellant had lived with them for several years. 
Williams testified that one day, while his mother was at work, appellant told him to go to a
friend's house because appellant might "do something bad that he would have to go to jail
for." Williams and his little brother went to a neighbor's house a block away. When
Williams returned to his house, appellant and Ricky "Red" Roosa (who had been with
appellant before Williams left) were gone but there were dark brownish spots on the
carpets and walls that appeared to be blood. A criminologist for the DPS Crime Lab
testified that tests confirmed the existence of human blood on the walls, carpet, and on and
under the cushions in the couch at appellant's residence.

 David Walker with the Wise County Sheriff's Department testified that they had few
leads after several months of investigating the Peoples and Sanders murders. The first lead
came when Keisha Jones, appellant's sister, told her own probation officer, after her
brother's arrest, that appellant "knew something" about the murder of Peoples and Sanders. 
After speaking with Keisha, Walker began preparing an arrest warrant for Ricky "Red"
Roosa, and Rangers Akin and Johnson obtained a search warrant for appellant's residence.

 Paula Freeman testified for the defense. She stated that she and appellant had lived
together for about three or four years. She testified that all of appellant's wrong-doing was
Red's fault and that appellant was heavily influenced by Red. (35) She stated that appellant was
trying to stay away from the gang and out of trouble, and that he would not have done
anything if not for Red's influence. She testified that appellant was affectionate with her
children, was "a really good person [who] [j]ust went the wrong way," and she asked the jury
to spare his life. On cross-examination, Freeman testified that she found blood stains on
the walls and the carpet of her house. She stated that when she came home and saw the
stains, she called appellant who told her he had been in a fight with his friend. The next
time she saw appellant, he wanted money to leave town.

 Appellant's sister, Keisha Jones, was also called by the defense. On cross-examination, Keisha stated that appellant had talked to her "somewhat" about the Sanders
and Peoples murders, and that she, in turn, had talked to her probation officer and Rangers
Akin and Johnson about what he had said. Keisha testified that appellant told her that he was
talking to Peoples in the living room when Red came from behind and hit Peoples with a
barbell. Red then threatened appellant that if he did not help "finish what he started," he
would hurt Freeman and her son. Keisha admitted that she had not mentioned Red's threat
when she gave her statement to the police but did when she testified before the grand jury. 
Keisha testified that although she originally told the rangers that Sanders was forced to sit
on the couch and watch while they killed Peoples, she later learned from Freeman that
Sanders had remained in the car and appellant went out and got him after Peoples was killed. 
Keisha also testified that she was mistaken when she told the rangers that appellant told her
that he and Red had committed the murders for money, jewelry, and crack. She explained
that appellant and Red took these things after the murders, but that was not appellant's
original intent. Finally, the State established through Keisha's cross-examination that
appellant had told her that Sanders and Peoples arrived at appellant's house in a car, and that
appellant and Red placed Sanders' and Peoples' bodies in a car after they were murdered. (36) 

 Keisha Jones' testimony of what appellant had told her about the double murder was
fully admissible and mirrored, to a large extent, appellant's written statement to Akin. In
both, appellant admitted his participation in the murders, yet minimized his own role. In
both, appellant said Red was the main actor and the actual killer of Peoples and Sanders. In
both, appellant stated that Red hit Peoples in the head with a barbell. In both, appellant
stated that the victims arrived in a car which was used to transport the bodies away from
appellant's residence after the murders. Keisha's testimony added: 1) that Red made an
explicit threat against appellant; 2) that she initially told police that Sanders was forced to
sit on the couch and watch Peoples' murder; and 3) that she initially told police that
appellant's and Red's motive for the murders was robbery. Although appellant's statement
to Akin added more detail to the events surrounding the double murder, appellant's
voluntary, noncustodial statements to his sister constitute an unequivocal admission of his
participation in Peoples' and Sanders' deaths.

 The defense also called psychologist Dr. Raymond Finn who had interviewed and
evaluated appellant. Finn acknowledged appellant's participation in Sanders and Peoples
murders and agreed that appellant's behavior in those murders was manipulative "to some
extent."

 The State called several witnesses in rebuttal, including Dr. Randall Price, a clinical
and forensic psychologist, who had interviewed and evaluated appellant. Price testified
about a psychopath's view of right and wrong and discussed appellant's failure to accept
responsibility for his actions as one of the stronger traits of a psychopath. He pointed to
appellant's blaming of his alter ego, James, for Bryant's death and his blaming of Red for
Sanders' and Peoples' deaths. Price also testified that appellant did a "double denial of
responsibility" when he told Price that "James wouldn't have killed his aunt if Red hadn't
made him help kill Sanders and Peoples." Appellant told Price that he chose to go along
with Red because of his desire to get drugs, but that it was Red's idea to kill Sanders and
Peoples. Appellant admitted to Price that he felt worse about killing Sanders because he
and appellant were childhood friends.

 In summary, the jury knew of appellant's involvement in the murders through
multiple sources unrelated to the Akin statement. (37) Although the Akin statement fills in
some details not included in the other evidence, appellant's participation in the murders is
well established through other witnesses and evidence. Despite the fact that the statement
contained some prejudicial evidence not reported by other sources, (38) the statement did not
carry the weight a confession might normally bear in light of the volume and weight of the
other evidence against appellant on the future dangerousness issue. Indeed, it was
established at the guilt stage that appellant brutally killed his elderly aunt by beating her
with a baseball bat. Evidence showed that appellant regarded Ms. Bryant as his favorite
aunt and that she had treated him kindly over the years. Nonetheless, he killed her so he
could steal whatever money she had in her purse to purchase drugs. In addition to the
evidence introduced at the guilt or innocence phase of the trial, the State offered
considerable evidence at the punishment stage. Appellant was convicted of several
offenses as a juvenile, including an assault of two teachers, possession of a handgun, and an
assault on another student by setting fire to her hair. One of the teachers assaulted by
appellant, Mark Turner, described appellant's resistance to the teachers' efforts to restrain
him: "[appellant was] just going crazy, just punching and biting and snarling . . . like the
Tasmanian Devil." It took five male teachers and a police officer to restrain and handcuff
appellant. Appellant was not allowed to return to the school.

 Substantial evidence was introduced of appellant's membership in the Hoova Crips
gang. Photographs of appellant's many gang-related tattoos were admitted into evidence. A
Fort Worth police officer with experience in the police department's gang unit testified at
length about the gang significance of appellant's tattoos. He described nearly all of the
tattoos as referring to the Five Deuces Crips gang or the Hoova Crips gang. Thus, even
without the two extraneous murders, the evidence of a brutal murder, of multiple assaults,
and of gang membership supports the jury's conclusion that appellant was a future danger
and that mitigating circumstances did not warrant a life sentence. 

 We look also to the content of the erroneously admitted statement. Although
appellant admitted his participation in the two extraneous murders in the Akin Statement,
that statement was replete with self-serving assertions of how Ricky "Red" Roosa was the
primary actor and appellant simply did what Red told him to do. When discussing the
actual murders, appellant stated:

 When little Boo [Clark Peoples] walked in, Red, Ricky, hit him, little Boo,
with a barbell. He hit him more than three times. Little Boo was hollering. 
He fell to the floor. Red told me grab him and hold him. I held little Boo
down while Red choked him with his hands. Red started hitting little Boo
harder and harder. Red was hyped from this shit. Red told me to bring a belt
to tie little Boo. I took a braided leather belt out of my pants. Red tied little
Boo with the belt. Red told me to help move little Boo out of sight. We
moved little Boo into the back room. ... Marc [Sanders] came in the house
and Red hit him in the head with the barbell. Red was mad because it took
Marc a long time to give up. Red kept on hitting Marc until he fell. Red took
the barbell a[nd] pushed it down against Marc's neck. He told me to bring
something to tie Marc up with. I brought him a white extension chord [sic]. 
We tied him up.


Appellant stated that after both men were dead, he helped Red put their bodies into Peoples'
car and Red told appellant where to drive the car to dispose of the bodies in a river. While
this statement contains some details that were not otherwise testified to by other witnesses
as set out below, it contains a wealth of mitigating facts about appellant's role in the double
murders. If believed, it diminishes and limits other evidence of appellant's participation in
the extraneous murders. It also supports the basic defensive theory at the punishment stage
that it was Red's bad influence that set appellant down the path toward his alter ego's
murder of his aunt. 

 Under a Chapman analysis, we may also consider the extent to which the error was
emphasized by the State. (39) In closing arguments, the State referred to the Akin statement
twice. The first prosecutor addressed the voluntariness of the statement and pointed to
other sources of evidence supplying the same information as that contained in the
statement:

 The issue of voluntariness is before you again. The issue of
voluntariness of the defendant's statement, and I want to address that head-on
with you.... I put together here every piece of evidence that will show you
how many times the defendant was specifically given Miranda warnings.... 
And no fewer than one, two, three, four, five, six, seven times from
September 11 to September 21st did the defendant have someone go over his
adult warnings with him. I imagine he was qualified, at that point, to give
them to somebody else. I would imagine he knew them by heart by then.

 But let's say one or two or three of you decide that you don't like the
way Ranger Akin took the statement. For those of you who decide that, you
know that [appellant] admitted everything to Keisha. And you have her
testimony on that issue, too. So that one shouldn't hang you up at all. 
Whether you come down on the side that, yes, it was a knowing waiver, he had
six, seven opportunities to hear those before he talked to the Ranger; or, no,
it wasn't voluntary, and you want to go off on what Keisha had to say.


The second prosecutor pointed to the Akin statement as evidence refuting the notion that
appellant was surprised when Red killed Peoples: 

 And counsel for the defense says, well, it was a surprise to this
defendant that Red or Ricky Roosa, was going to kill Clark Peoples. Well,
you know in his statement, and I ask you to look at his statement, because
what he says is Ricky Roosa asked me, do you know anyone with money. And
that's where it begins.


Although we find this reference to the erroneously-admitted statement somewhat troubling,
it was a response to the defense closing argument concerning appellant's minor role in the
double murder and more of a rhetorical flourish ("And that's where it begins") than any
disparagement of the defensive theory.

 Further, the Akin statement by no means belittled appellant's overall mitigation
case-which rested on the proposition that appellant suffered from a dissociative mental
disorder manifested in a second personality called "James." Defense witnesses Keisha
Jones, Paula Freeman, and Dr. Finn each testified about the presence of appellant's alter
ego, James. James was made to kill appellant's aunt, but only because Red had appellant
help kill Sanders and Peoples. Neither at trial nor on appeal does appellant argue that there
was any dispute that he had, in fact, participated in the murder of Sanders and Peoples. We
find that there were no collateral implications, detrimental to appellant's defense, that
stemmed from the taking or admission of the Akin statement itself. (40)

 Thus, we cannot conclude that the jury would have placed any particular weight upon
the Akin statement when deliberating on the special punishment issues, given the quantity
and quality of the other admissible evidence which supports their findings. (41) 

 We are confident, beyond a reasonable doubt, that the erroneous admission of the
Akin statement did not materially contribute to the jury's finding that there is a probability
that appellant would commit criminal acts of violence that would constitute a continuing
threat to society. (42) We are also confident that, had the Akin statement not been erroneously
admitted into evidence, there is no reasonable likelihood that the jury might have returned
an affirmative answer to the mitigation special issue.

 We emphasize that a defendant's confession is generally likely to have a profound
impact on a jury, especially at the guilt stage of a trial. (43) Nonetheless, given the evidence
and circumstances in this particular case, the admission of the Akin statement during the
punishment stage was harmless beyond a reasonable doubt. Point of error one is overruled.

II. Claims concerning jurors.

A. Claim concerning the discharge of a juror.

 

 In his second point of error, appellant claims the trial court erred by refusing to
grant appellant's motion for mistrial upon learning that a juror knew, and would be affected
by knowing, the father of the victim of an extraneous murder presented at punishment. 
During the guilt or innocence phase of trial, juror David Guminski reported that he
recognized Ed Sanders, who was present in the courtroom, as a former coworker. Sanders
was the father of Mark Sanders, but Guminski was not aware of Sanders' connection to the
case. Addressing the court in chambers, Guminski stated that he had not formed any
opinions about Sanders as an audience member or a witness and did not believe he would be
biased one way or the other. On the basis of this information, appellant asked the court to
discharge Guminski or, alternatively, to grant a mistrial. The court asked the parties to
brief the options over the weekend. Upon reconvening, appellant proposed that no evidence
be offered about Sanders' son. Appellant also asked that he be allowed to question
Guminski to determine possible bias. Appellant concluded by asserting that the only real
remedy was a mistrial. The court denied his motion for a mistrial, but granted his request
to call Guminski for additional questioning.

 Guminski testified that Sanders had been his supervisor at the Colonial Country
Club. He stated that they were on friendly terms at work, but did not have a social
relationship, and that he had not had any contact with Sanders in the past year-and-a-half. 
Guminski testified that he had "a little bit of uneasiness" about knowing a potential witness
and further stated that if he were to learn that Sanders had suffered some type of loss, he
would probably have more empathy toward him than he would toward a stranger. Appellant
renewed his motion for mistrial and, in the alternative, asserted that Guminski was
"impaired." The court denied his requests, and Guminski was questioned further. Guminski
explained his uneasiness as the result of worrying that he had overlooked Sanders' name on
the witness list. He also testified that although he believed he could be impartial, he could
not help "but think a little bit of empathy is going to leak out in [Sanders'] favor." Appellant
re-urged his motion for mistrial as the only appropriate remedy. As an alternative,
however, appellant requested that Guminski be excused. The court granted appellant's
alternative request and excused Guminski. Appellant now claims on appeal that the remedy
of discharge was inappropriate because bias is not a disability under Article 36.29(b).

 Appellant's point of error complains of the trial court's failure to grant his motion
for mistrial. Appellant does not, however, present any argument or authority in support of
his claim that the mistrial should have been granted. Appellant has therefore failed to
adequately brief this mistrial issue. Tex. R. App. P. 38.1(h).

 Appellant's argument and authorities are all directed toward his contention that the
trial court's discharge of Guminski was inappropriate under Article 36.29. Although
appellant argued at times before the trial court that discharge under Article 36.29 would be
inappropriate, he nonetheless proposed discharge as an alternative to mistrial at least three
times. Because appellant requested the discharge as an alternative to mistrial, he is now
estopped from complaining about it. (44) Appellant had the option of contending at trial that
mistrial was the sole legal and appropriate remedy, and he could have declined to suggest or
support any alternatives. By proposing alternatives he is estopped from complaining on
appeal about the judge having accepted one of them. (45) Parties are often faced with difficult
choices, but facing a tough dilemma does not create a claim or excuse a party for the option
chosen. (46) Point of error two is overruled.

B. Claim concerning the definition of "criminal acts of violence."

 In his third point of error, appellant claims the trial court erred by instructing a
prospective juror that the definition of "criminal acts of violence" includes a threat of
violence. During appellant's voir dire of a prospective juror, the following exchange
occurred:

 [Defense counsel]. I want to point out one other thing. We are not talking
about - it says the probability is, would he commit criminal acts of violence. 
It does not say, with threats of violence. It doesn't say, would get in fights. It
said, would commit criminal acts of violence. That means a criminal act
involves violence. Common words are your use and understanding. You
understand it does not say a threat of violence or was there misconduct. It
has to be a criminal act of violence. 


 [Prosecutor]. Judge, I am going to object. I think I am going to object
because I think act does include speech, and certainly a threat of violence
may be a criminal act under the law.


The trial court sustained the State's objection, and upon a motion by the State to instruct the
juror to disregard, the court instructed the juror:

 The jury will be looking at acts of violence and inasmuch as a threat involves
conduct, it could be an act of violence depending on what the jury decides.


Appellant objected to the court's instruction, arguing that a threat was not a criminal act of
violence. The court overruled appellant's objection.

 After properly reminding the venireperson that the jury would be "looking at acts of
violence," the remainder of the instruction clarified that it would be in the discretion of the
jury to decide whether a threat involves conduct and, if so, whether it would then constitute
an act of violence. This instruction is consistent with the language of the issue. The trial
court did not err in giving the instruction. Point of error three is overruled. 

C. Claims concerning denial of writs of attachment for prospective jurors, a
continuance, or a motion to quash panel.


 In his fourth point of error, appellant claims the trial court erred in denying his
application for writs of attachment requiring the appearance of prospective jurors who
submitted purported disqualifications on unsworn juror cards, contrary to jury selection
procedures. In point of error five, appellant claims the trial court erred in denying his
motion for continuance to provide time for the process of service for the sought-for writs
of attachment. In point of error six, appellant claims the trial court erred in denying his
motion to quash the jury panel due to the alleged noncompliance with jury selection
procedures. Appellant briefs these points together.

 Several members of the venire mailed in juror cards claiming disqualifications. 
Appellant complained about allowing mail-in exemptions and disqualifications, pointing out
that some of the mail-in prospective jurors had simply marked the disqualification they
claimed on the front of the juror cards without signing the affirmation swearing to the
veracity of the claimed disqualification. Appellant claimed this procedure violated
statutory provisions, and he sought a writ of attachment, a continuance to allow time to
summon the absent prospective jurors, and a quashing of the affected panel. 

 Article 35.01 provides a method for writ of attachment for absent jurors. It is 
"directory, not mandatory, and in the absence of governmental misconduct in summoning
the venire, the failure to grant attachments is not reversible error unless appellant shows
injury." (47) To make a showing of injury, appellant must demonstrate that he was forced to
take an "objectionable juror":

 An objectionable juror, in the sense in which the term is used in this
connection, means "one against whom such cause for challenge exists as
would likely affect his competency or his impartiality in the trial." (48)


 Appellant points to the place in the record where he identified two jurors who were
seated but who were allegedly "objectionable." However, because appellant did not then or
now point to any evidence in support of his allegation that these jurors were challengeable
for cause, he has failed to meet his burden of showing he was forced to accept two
challengeable jurors. (49) Points of error four, five, and six are overruled. 

III. Arrest and search issues.

 In his seventh point of error, appellant claims the trial court erred by admitting
evidence seized during his arrest pursuant to an allegedly illegal arrest warrant. Appellant
argues that Judge Larry Reed, who issued the capias pro fine traffic warrants upon which
appellant's arrest was based, did not have probable cause because he lacked personal
knowledge that the fines were not paid.

 Article 45.045 provides for the issuance of a capias pro fine for a defendant's
arrest "if the defendant is not in custody when the judgment is rendered or if the defendant
fails to satisfy the judgment according to its terms." While a capias is issued after a
judgment has been rendered against the defendant, it must still be supported by probable
cause. (50) But because a judgment against a defendant signifies a finding beyond a reasonable
doubt that he has committed the charged offense, we have held in the context of a parole
violation that a judgment coupled with a finding by the court that there is a "reason to
believe" that the defendant has violated the conditions of his parole will constitute
sufficient probable cause to support the issuance of a parole violation warrant. (51) While a
traffic violator, unlike a parolee, is not subject to a judgment imposing a term of
imprisonment, the judgment establishing the traffic violation nonetheless carries
considerable weight and validity because it is based upon a finding beyond a reasonable
doubt. Thus, a judgment for a traffic violation, together with a finding by the court that the
defendant has failed to satisfy its terms, will comprise sufficient probable cause to support
issuance of the capias pro fine. (52) 

 Municipal Court Judge Larry Reed testified that he signed the capias pro fine
warrants calling for appellant's arrest due to his failure to pay the fines imposed for various
traffic offenses. He explained that he reviewed the file in each case. Each file contained a
complaint and judgment. Each judgment stated that appellant was found guilty of the
offense, set forth the amount of the fine assessed, and provided the due date. Judge Reed
testified that after reviewing each judgment to verify dates and numbers, if the file
contained no notation, receipt, or documentation from the clerk stating that the fine
assessed had been paid, he would then determine the amount of the increased fine and issue
the capias pro fine. Judge Reed further testified that he had been a municipal judge for
over four years and had worked as a city attorney for fourteen years prior to that. Judge
Reed testified that he reviews approximately 600 to 800 files a week for failure to appear
or failure to satisfy the judgment in traffic offense cases and that this was the standard
procedure in all such cases.

 Given his years of experience in the procedures of the municipal court and his
knowledge as to the reliability of the system and the operation of the clerk's office, Judge
Reed made an adequate determination that there was a reason to believe the judgments had
not been satisfied in appellant's cases. The trial court did not abuse its discretion in
concluding that probable cause existed to issue the arrest warrant. Point of error seven is
overruled.

 In his eighth point of error, appellant claims the trial court erred in admitting the
evidence obtained as a result of the allegedly illegal search of the Hyundai in which he was
a passenger immediately before his arrest. Appellant argues that the search of the Hyundai
was not made pursuant to a lawful arrest or a valid need for officer safety.

 We established in the previous point of error that appellant's arrest, under warrant,
was legal. And regardless of whether the search was justified by a need for officer safety,
appellant has failed to establish that he had a legitimate, reasonable expectation of privacy
in the car. (53) Paula Freeman was driving the Hyundai, and appellant was hiding on the
floorboard in the backseat when Officer Serra approached the car at a gas station. Appellant
suggests he has standing to contest the search based on the fact that he had previously
received traffic tickets while driving the Hyundai. But appellant offered no evidence that he
had permission to drive the car in those instances, that he had any continued permission to
drive the car, or that he had any possessory interest in it. The fact that appellant had driven
the car on previous occasions does not establish that he had any continued permission to do
so, had an ownership or a possessory interest in the car, or otherwise had a reasonable
expectation of privacy in it. (54) Point of error eight is overruled.

 In his ninth point of error, appellant claims the trial court erred in admitting
evidence seized from his residence. Appellant argues that the search was illegal because it
was conducted pursuant to consent from a third-party who appellant claims lacked authority
to allow a search of appellant's personal effects.

 Paula Freeman owned the house searched. Freeman testified at the suppression
hearing that appellant was her boyfriend and that he had lived with her off-and-on for a
couple of years. Freeman testified that, on the day after Ms. Bryant's murder, she agreed to
let the officers search the house, and she knew that they were searching for appellant's
clothes and shoes. Specifically, she testified that the officers were looking for clothes
matching a description she herself had given them of the clothes appellant wore on the
night of Ms. Bryant's murder. Freeman stated that she understood that the items would be
seized if found. Freeman testified that she did appellant's laundry at her house and that she
sometimes wore appellant's clothes. The officers seized some of appellant's clothing and a
photograph of appellant and Red Roosa.

 A third person may validly consent to a search when he has "equal control and equal
use of the property searched." (55) Further, "common authority derives from the mutual use
of the property, not the ownership or lack thereof." (56) 

 Freeman shared mutual use of her house with appellant such that she had authority to
grant consent to a search of the entire house. Appellant does not dispute Freeman's
authority to consent to the search of her house; instead, he claims she had no authority to
consent to the seizure of his personal effects found there. But the officers did not need
Freeman's consent to seize evidence of a crime found within the scope of a lawful search. (57) 
The trial court did not err in admitting the evidence. Point of error nine is overruled.

IV. Challenges for cause and excusal of venirepersons.

 In point of error ten, appellant claims the trial court erred by overruling a challenge
for cause against a venireperson who viewed a mere threat of violence to be a criminal act
of violence. In point of error twelve, appellant claims the trial court erred in denying
appellant's challenge for cause against a prospective juror on the ground that the juror
would define "criminal act of violence" as including a property crime with no attendant
violence.

 The phrase "criminal act of violence" has not been defined by the legislature. 
Therefore, jurors are presumed to attach a common meaning or understanding to the
terms. (58) 

 Veniremember Ginny Smith testified that a criminal act of violence meant "murder
or . . . a violent crime [such as] rape and stabbing." When asked by defense counsel whether
a threat to kill someone would be enough or whether a "mere threat" would be sufficient to
constitute a threat to society, Smith stated that it would. Appellant moved to challenge
Smith on the ground that a threat did not amount to an act of violence, and that such a
definition decreased the State's burden of proof. The trial court denied the challenge.

 A threat might reasonably be viewed as something that could be accomplished by
acts or words. For instance, a threat of violence can be made by brandishing or displaying a
weapon. (59) Threats can be coercive and have a profound impact on the person to whom they
are directed. (60) Thus, Smith was permitted to attach a reasonable, commonly accepted
meaning to the term "criminal act of violence" and the trial court acted within its discretion
in denying appellant's challenge against her.

 Venireperson William Perkey testified during voir dire by defense counsel that, in
his view, a property crime like theft is a criminal act of violence. Appellant seems to
suggest that this Court should establish a bright-line rule that property offenses are not
criminal acts of violence. Because the law does not define "criminal acts of violence," 
Perkey is presumed to understand the term and attach to it a common meaning. (61) Thus, the
trial court did not abuse its discretion in denying appellant's challenge for cause against
Perkey. Points of error ten and twelve are overruled.

 In appellant's eleventh point of error he contends that the trial court erred in denying
his challenge for cause against a venireperson who appellant claims would automatically
answer the first special issue in the affirmative unless the defendant was physically
incapacitated. Venireperson Hollis Woolsey initially testified during voir dire by defense
counsel that once the defendant was found guilty of capital murder, he would consider that
person to be a continuing threat. Woolsey testified that he would answer the issue in the
negative if the defendant was physically incapacitated in some way such as being in a
wheelchair or being "60 years old and diabetic." When asked by defense counsel whether
the defendant would have to be physically incapacitated, Woolsey responded "probably." 
However, when the State explained that he could not automatically answer that issue in the
affirmative based only on a finding of guilt, but would have to consider all of the evidence,
Woolsey agreed that he would do so.

 Given Woolsey's agreement to listen to all the evidence before answering the
special issue, the trial court did not abuse its discretion in denying appellant's challenge for
cause. (62) Point of error eleven is overruled.

 In his thirteenth point of error, appellant claims the trial court erred by granting a
venireperson's excuse from service for an economic reason, outside the presence of
appellant and his counsel. Summoned venireperson Sean Cerone submitted a letter to the
court asking that he be excused from jury duty on January 11, 2001, and suggesting other
dates that he could serve:

 This letter is in response to a juror summons I received on December 21 to
serve as a juror Thursday January 11, 2001. I am requesting to be excused
for that date due to the fact that I am a dentist in a private practice setting and
have no one available to cover my patient appointments. With that relatively
short notice, I already have a full day of patients scheduled that day and
cannot reschedule them without extreme difficulty and hardship to both them
and myself. I would be very willing to commit to a jury summons in the near
future when I can better arrange my patient scheduling responsibilities and
care for my patients while I would be out.


 My office generally schedules approximately 8 weeks out, so may I suggest
March 30, 2001, or April 6, 2001, as dates when I can properly arrange my
office schedule to allow for adequate care of my patients. I appreciate your
understanding in his matter. Please reply.


 Article 35.03 provides that the trial court "shall then hear and determine excuses
offered for not serving as a juror, and if the court deems the excuse sufficient, the court
shall discharge the juror or postpone the juror's service to a date specified by the court." 
The statutory restriction on which appellant relies provides that a prospective juror may not
be excused for "an economic reason" without the presence and approval of both parties. (63) 

 Cerone did not ask to be excused because he needed the income from his patients on
those days; rather his letter describes a scheduling problem due to the short notice. This is
apparent from his suggestion of other dates on which he would be willing to serve that
would allow him enough time to arrange his schedule. The postponement of jury service
because of pre-existing scheduling conflicts is not the same as a person's claim that he
cannot serve as a juror because he would lose income as a result of that service. (64) The trial
court did not abuse its discretion in concluding that Cerone's letter was not asking to be
excused for an "economic reason." (65) Point of error thirteen is overruled.

V. Claims concerning the constitutionality of the Texas death penalty statute.

 In his fourteenth point of error, appellant claims the Texas death penalty statute
violates the Eighth Amendment because it allows the jury too much discretion and lacks the
minimal standards and guidelines necessary to avoid an arbitrary and capricious imposition
of the death penalty. Identical complaints have been addressed and rejected by this Court. (66) 
Appellant makes no new arguments concerning this claim. Point of error fourteen is
overruled.

 In his fifteenth point of error, appellant claims the Texas death penalty statute
violates the Eighth Amendment as interpreted in Penry v. Johnson (Penry II), (67) because the
mitigation instruction sends "mixed signals" to jurors. Appellant argues that the statutory
mitigation instruction given in his case suffers from the same constitutional flaw of
sending "mixed signals" as the court-made nullification instruction submitted in Penry II
because the statutory mitigation issue is unclear as to the burden of proof. Except for flatly
asserting that the mitigation issue sends "mixed signals" because it is "unclear as to the
burden of proof," appellant does not explain in what way this apparent lack of clarity
constitutes a "mixed signal" like that at issue in Penry II. In light of our previous holdings
that the mitigation issue is not unconstitutional for its failure to assign a burden of proof,
appellant has not convinced us of any constitutional flaw. Point of error fifteen is
overruled.

 In his sixteenth point of error, appellant claims the Texas death penalty statute
violates the due process requirements of the Fourteenth Amendment by implicitly placing
the burden of proof on appellant rather than requiring that a jury make a finding against
appellant on that issue beyond a reasonable doubt. Appellant argues that, under Apprendi v.
New Jersey, (68) the Texas scheme is unconstitutional for failing to require a jury finding
beyond a reasonable doubt that there are no mitigation circumstances that would warrant a
life sentence. Thus, appellant claims, the burden of proof would be on the State to prove
beyond a reasonable doubt that the mitigating circumstances do not warrant a life sentence.

 Apprendi is inapplicable to Article 37.071. Apprendi applies to fact findings that
increase the penalty beyond the "prescribed statutory maximum." Under Article 37.071,
the "prescribed statutory maximum" is fixed at death. There are no statutory enhancements. 
A jury finding on the mitigation issue does not have the potential of increasing the penalty
beyond the prescribed statutory maximum, rather it has the potential for reducing the
prescribed statutory maximum to a sentence of life imprisonment. Point of error sixteen is
overruled.

 The judgment of the trial court is affirmed.

Cochran, J.

Delivered: November 5, 2003


Publish 


 

APPENDIX



1. Unless otherwise indicated, this and all future references to Articles refer to the Texas Code of
Criminal Procedure.
2. 384 U.S. 436 (1966).
3. 470 U.S. 298 (1985).
4. Throughout its opinion the Miranda Court emphasized the importance of giving the required
warnings "at the outset" of, or "prior to," any interrogation to ensure that subsequent statements would be
voluntary. Miranda, 384 U.S. at 445, 457, 465, 468, 474, 478.
5. Id. at 444. Although Miranda itself spoke of a broad prohibition against the government's use
of an unwarned statement, the Supreme Court later held that a non-Mirandized, but otherwise voluntary
statement could be used to impeach a testifying defendant's credibility. Harris v. New York, 401 U.S.
222, 225-26 (1971).
6. 470 U.S. at 300.
7. Id. at 301.
8. Id. at 301-302.
9. Id. at 302.
10. Id. at 308.
11. Id. at 309.
12. Id.
13. Both the State and the concurrence stress the number of times appellant had been warned by
Officer Gates and a neutral magistrate concerning his Miranda rights in relation to the murder of Ms. Bryant
to show that he did not need to be warned again by Ranger Akin concerning his rights in relation to the
murder of Sanders and Peeples. It is true that "the mere passage of time" does not, by itself, automatically
obviate prior Miranda warnings. 

 The cases cited by the concurrence are very appropriate to, and might well be dispositive of, this
issue had the interrogation been by Officer Gates about Ms. Bryant's murder. See Ex parte Bagley, 509
S.W.2d 332, 335 (Tex. Crim. App. 1974) (same A.D.A. gave multiple warnings; all questioning concerned
one offense); Gorman v. United States, 380 F.2d 158, 164 (1st Cir. 1967) (repetition of Miranda
warnings before requesting consent to search unnecessary because we "see no reason in policy or
precedent automatically to borrow a procedure adapted to one set of constitutional rights at one stage of
a criminal proceeding and apply it to a quite different right, serving quite different purposes, at another
stage); People v. Hill, 233 N.E.2d 367, 369 (Ill. 1968) (same officer, same offense; defendant made a
"delayed" response to officer's initial question); Maguire v. United States, 396 F..2d 327, 330 (9th Cir.
1968) (three days; same offense, different officer); United States v. Springer, 460 F. 2d 1344, 1352, (7th
Cir. 1972) (same offense; same FBI agent; same warnings, but 1st were oral and 2nd written); Biddy v.
Diamond, 516 F.2d 118, 122 (5th Cir. 1975) (12 day lapse of time did not destroy effectiveness of original
Miranda warnings when defendant was warned by same officers earlier, released, officers had multiple
contacts with defendant at her home, and she later made a statement to her husband in front of officers at
station after they reminded her of their earlier warnings); Johnson v. State, 324 So.2d 298, 302 (Ala.
Crim. App.), cert. denied, 324 So.2d 305 (Ala. 1975) (same officer, same offense, reminder about
warnings given three days earlier); State v. Gilbreath, 487 P.2d 385, 386 (Ariz. 1971) (same offense,
apparently same officers, no need to repeat warnings given 12 to 36 hours earlier because no
"circumstances which might alert the officers that an accused may not be fully aware of his rights"); Jackson
v. State, 375 N.E.2d 223, 225 (Ind. 1978) (stating that defendant's statement was not the result of
interrogation, but "[e]ven if warnings were required, the earlier warnings were sufficient in light of the
defendant's clear recognition of his right to remain silent. He conditioned his statement upon the presence
of the prosecutor, showing he knew of his right to remain silent, and was waiving that right"); State v.
Russell, 261 N.W.2d 490, 492-93 (Iowa 1978) (statements made in ambulance and three days later in
hospital admissible after deputy had Mirandized defendant twice at arrest scene, and different officer
reminded defendant of those earlier warnings and defendant stated he remembered and wished to waive
them); State v. Brown, 601 S.W.2d 311, 314 (Mo. App. 1980) (same officers, same offense, after
reminder of rights given three days earlier, defendant waived rights and gave statement); State v. Blanchey,
454 P.2d 841, 845 (Wash., Dept. 2 1969) (same offense, prior warnings by Canadian officials, fresh
warnings by state detectives, but woven into conversation, defendant told detectives that he understood
his rights and gave statement); Kroger v. State, 17 P.3d. 428, 431-33 (Nev. 2001) (same offense, second
officer knew defendant had already been warned and defendant told officer she had been warned before);
Mitchell v. State, 982 P.2d 717, 722 (Wyo. 1999) (same offense, officer reminded hospitalized defendant
of warnings given by another officer several hours earlier and began to summarize them when defendant
said he remembered and was willing to talk); DeJesus v. State, 655 A.2d 1180, 1195-96 (Del. 1995)
(same officers, same offense, six-minute break in interview).

 

 As the Fifth Circuit phrased the issue in Biddy v. Diamond: 

 The critical legal question is whether the overall activity of the police sufficiently comports
with the requirements concerning the Miranda warnings to insulate the conduct and
admissions against suppression.


516 F.2d at 122. Here, Ranger Akin was not the same officer who had originally, or at any later time,
given appellant Miranda warnings before questioning him. Ranger Akin was questioning appellant about
an entirely different offense, not the offense for which appellant had been Mirandized. There is no evidence
that Ranger Akin ever asked appellant or anyone else if appellant had been warned by other officers,
whether he remembered those warnings, and wished to waive or invoke them. Ranger Akin testified that,
in his mind, a custodial "discussion interview" in not a custodial interrogation which requires Miranda
warnings. While the mere passage of time would not necessarily dissipate the effectiveness of Miranda
warnings, there is no factual similarity between this case and those which have held that, under the totality
of the circumstances, the police conduct in question complied with the basic tenets of Miranda.
14. Elstad, 470 U.S. at 315.
15. Id. at 315-16; see also id. at 309 (expressing concern for errors made by law enforcement in
judging whether suspect is in custody or in administering proper Miranda warnings).
16. Ranger Akin testified that he did not think that he was "interrogating" appellant for purposes of
Miranda warnings until he was ready to ask appellant to sign the written statement that appellant had orally
made and which Ranger Akin had already transcribed "verbatim." Specifically, Ranger Akin testified that
appellant "was Mirandized prior to the statements, him signing, before initials, reading as he is given those
words, that is exactly right.... The document was not finished-wasn't finished until he initialed and signed
it, yes sir. At that point, he was advised of his rights." When appellant's attorney asked if that was how
he normally interrogates a suspect, Ranger Akin replied, "I don't think that what you are talking about is
an interrogation. That's a matter of taking a statement, not an interrogation." The colloquy continued:


Q: When you sat down and started talking to [appellant], did you read his Miranda rights to him at
that point?

A: Not at that point, no sir.

Q: Why didn't you do that at that point?

A: We just went into conversation, and then went into discussion interview about the murder, and then
at the point prior to finishing this statement, he was advised of his rights from this form.

Q: I understand. Why didn't you do it prior to the time you started questioning?

A: I really didn't see the need to since we did it right here prior to completing this statement.


Miranda, however, indisputably requires a law enforcement agent to give the appropriate legal warnings
before any questioning or "discussion interview," not merely prior to signing a written statement after all the
custodial interrogation is complete. 384 U.S. at 445, 457, 465, 468, 474, 478.

17. See United States v. Carter, 884 F.2d 368, 373 (8th Cir. 1989) (stating that Elstad was
inapplicable to post-Miranda written confession in part because "second confession came almost on the
heels of the first" and custodial nature of interrogation was clear to officers); United States v. Gonzalez-DeLeon, 32 F. Supp. 2d 925, 928-29 (W.D. Tex. 1998) (holding Elstad inapplicable to suspect's post-Miranda statements where authorities interrogated suspect over an hour and elicited incriminating
statements before advising suspect of rights); State v. Seibert, 93 S.W.3d 700, 705-707 (Mo. 2002)
(holding Elstad inapplicable where officers intentionally refrained from giving Miranda warnings until
admission obtained and unwarned and warned portions of interview were part of one continuous process),
cert. granted, 123 S.Ct. 2091 (2003); Ramirez v. State, 739 So.2d 568, 575-78 (Fla. 1999) (holding
Elstad not applicable in part because juvenile suspect questioned at police station and gave incriminating
statements before receiving warnings and when suspect finally warned, officers attempted to minimize and
downplay significance of rights and used suspect's previous statements as leverage to compel him to waive
rights).
18. 931 S.W.2d 244 (Tex. Crim. App. 1996).
19. 762 S.W.2d 146 (Tex. Crim. App. 1988).
20. Dowthitt, 931 S.W.2d at 258.
21. Id. (emphasis added).
22. Id. at 259. In concluding that "[t]he warnings given in the present case were both constitutionally
and statutorily adequate," the Dowthitt Court's reference to the constitutional adequacy of the warnings
pertained to the defendant's claim that the person conducting the interrogation must be the same person
who gives the Miranda warnings. Id. at 258.
23. Allridge, 762 S.W.2d at 157.
24. See United States v. Cooper, 800 F.2d 412, 414 (4th Cir. 1986); Cervantes v. Walker, 589
F.2d 424, 426-27 (9th Cir. 1978). 
25. See Cooks v. State, 844 S.W.2d 697, 734 (Tex. Crim. App. 1992) (stating "[c]learly, while
incarcerated in the Dallas County Jail, appellant was 'in custody'" for Miranda purposes).
26. See United States v. Tejada, 956 F.2d 1256, 1260 (2nd Cir. 1992) (noting that "physical
evidence seized in violation of the Fourth Amendment - unlike an involuntary confession taken in violation
of the Fifth Amendment - is inherently reliable"); United States v. Schipani, 315 F. Supp. 253, 257-58
(E.D.N.Y. 1970) (discussing distinctions between Fourth and Fifth Amendments and concluding
"[d]ecisions excluding the use at sentencing of confessions obtained in violation of the Fifth Amendment are
not persuasive Fourth Amendment precedents"), aff'd, 435 F.2d 26 (2d Cir. 1970); see also Estelle v.
Smith, 451 U.S. 454, 469 (1981) (holding testimony by court-ordered psychiatrist about unwarned
statements made to him by defendant violated Fifth Amendment and were inadmissible at sentencing on
issue of future dangerousness); Pens v. Bail, 902 F.2d 1464, 1466 (9th Cir. 1990) (holding unwarned
confessions to extraneous crimes violated Fifth Amendment and were inadmissible at sentencing phase to
enhance sentence where elicited during court-ordered psychiatric treatment while incarcerated); but see
Del Vecchio v. Illinois Dept of Corrections, 31 F.3d 1363 (7th Cir. 1994) (stating exclusionary rule
would not apply at sentencing hearing, even assuming confession taken in violation of Miranda, because
no deterrent purpose served where confession taken fourteen years before introduced).
27. Tex. R. App. P. 44.2(a); see Cain v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).
28. See Chapman v. California, 386 U.S. 18, 24 (1967) (under constitutional error analysis,
reviewing court must reverse unless it is "able to declare a belief that [the error] was harmless beyond a
reasonable doubt"); Satterwhite v. Texas, 486 U.S. 249, 258 (1988) (applying Chapman harmless error
standard to admission of unwarned statement to psychiatrist at punishment stage of defendant's capital
murder trial).
29. McCarthy v. State, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001), cert. denied, 536 U.S. 972
(2002).
30. Id.
31. Tex. Code Crim. Proc. art. 37.071, §§ 2(b)(1) & 2(e)(1). 
32. Satterwhite, 486 U.S. at 256 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)). 
In Satterwhite, the Supreme Court noted that "the evaluation of the consequences of an error in the
sentencing phase of a capital case may be more difficult because of the discretion that is given to the
sentencer." Id. at 258. Nonetheless, we, like the Supreme Court, believe that reviewing courts "can make
an intelligent judgment" about whether the erroneous admission of a statement taken in violation of Miranda
might have affected a capital sentencing stage. See id.
33. United States v. Polanco, 93 F.3d 555, 562-63 (9th Cir. 1996) (analyzing Miranda-Elstad
error and finding it harmless because of "substantial other evidence" to prove the same fact as that
contained within the defendant's improperly admitted statement). See Milton v. Wainwright, 407 U.S.
371, 372-73 (1972) (admission of pre-Mirandized statement was harmless error beyond a reasonable
doubt because of the overwhelming evidence of the defendant's guilt); United States ex rel. Savory v.
Lane, 832 F.2d 1011, 1019-20 (7th Cir. 1987) (concluding that admission of testimony barred by Fifth
Amendment was harmless "[i]n light of the state's otherwise strong case, the relatively limited use of tainted
evidence, and the lack of probative value the tainted evidence had"); Gorham v. Franzen, 760 F.2d 786,
796 (7th Cir. 1985) ( stating that "[w]here a confession, otherwise voluntary, is inadmissible for failure to
comply with the strict procedural requirements of Miranda, reversal is not required if, on the facts in the
record, the court can find beyond a reasonable doubt that its use at trial was harmless"; finding error
harmless because there was other "extensive physical and testimonial evidence implicating" defendant in
murder); Harryman v. Estelle, 616 F.2d 870, 876 (5th Cir 1980) (when determining whether admission
of non-Mirandized statements is harmless, reviewing court must decide whether, absent that statement, the
evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of
the accused beyond a reasonable doubt; error harmless because other physical evidence was
overwhelming); Boyd v. Hawk, 965 F. Supp. 443, 448 (S.D.N.Y. 1997) (stating that "[a] constitutional
error arising from use of evidence is harmless if a jury would have reached the same guilty verdict without
hearing the additional, unconstitutionally obtained evidence"). 
34. See, e.g., Harrison v. Owen, 682 F.2d 138, 141 (7th Cir. 1982) (citing Milton and Schneble
and stating that defendant's improperly admitted statements were harmless when other, admissible
evidence, whose truth was unchallenged, proved the same facts and was "entirely consistent" with the
defendant's statements); Germany v. Estelle, 639 F.2d 1301, 1303 (5th Cir. 1981) (admission of
statement obtained in violation of Miranda harmless error in light or other admissible evidence and fact that
statement did not contradict either of defendant's defenses).
35. This is precisely the tenor of appellant's statement to Ranger Akin.
36. Captain David Walker with the Tarrant County Sheriff's Department testified that they located
a gray Altima belonging to Peoples' girlfriend. A search of the Altima revealed the presence of human
blood stains on the backseat.

 Photographs of Sanders' and Peoples' remains-when their bodies were discovered at the Trinity
River-were admitted into evidence. Both victims had ligatures around their necks and one also had a head
wound.

 Dr. Sheila Spotswood testified that she conducted Peoples' autopsy. She described Peoples'
injuries in detail and stated that cause of death was homicidal violence. Peoples' autopsy photographs were
admitted. Spotswood also testified about Sanders' injuries and his autopsy photos were admitted. 
Sanders' cause of death was also homicidal violence.
37. See Milton v. Wainwright, Polanco, Savory v. Lane, Gorham v. Franzen, Harryman,
Harrison v. Owen, Germany, all supra, note 33.
38. The primary difference between Keisha's testimony and the Akin statement was Keisha's
insistence that appellant went along with the murders because Red threatened to hurt Paula Freeman and
her son. Keisha's version also suggests that appellant did not plan the murders with Red beforehand but
went along with Red once Red had killed Peoples.
39. See Chapman, 386 U.S. at 25 (stating comment on defendant's failure to testify could not be
deemed harmless when "prosecutor's argument and the trial judge's instruction to the jury continuously and
repeatedly impressed the jury that [the jury could draw inferences of guilt] from the failure of petitioners
to testify"); United States ex rel. Savory v. Lane, 832 F.2d at 1020 (holding Miranda error harmless
because of state's otherwise strong case, as well as the state's relatively limited use of the tainted evidence).
40. See Germany, 639 F.2d at 1303 (concluding that erroneously admitted statement by defendant
did not "contradict either of petitioner's defenses, thus, "when faced with the overwhelming untainted
evidence ... and the peripheral impact of the incriminating statement on the strength of petitioner's asserted
defenses," error harmless); Harryman, 616 F.2d at 877 n.15 (noting that erroneous admission of
defendant's statement "had no effect, much less an adverse effect, on the conduct of [defendant's]
defense"; admission of non-Mirandized statement did not affect theory of defense). 
41. See Harrington v. California, 395 U.S. 250, 254 (1969) (any judgment as to the harmfulness
of constitutional error must be based on the reviewing court's "own reading of the record and on what seem
to have been the probable impact of the [inadmissible evidence] on the minds of an average jury").
42. See Milton v. Wainwright, 407 U.S. at 372-73; Schneble v. Florida, 405 U.S. at 429-32. 
43. McCarthy, 65 S.W.3d at 56. 
44. Cf. Prystash v. State, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) (holding that because
defendant requested deletion of issue from jury charge, he was estopped from complaining about its
absence on appeal). 
45. See Benson v. State, 496 S.W.2d 68, 70 (Tex. Crim. App. 1973) (stating that "[a]ppellant
cannot now be heard to complain because the court granted him what he asked for").
46. See Ripkowski v. State, 61 S.W.3d 378, 389 (Tex. Crim. App. 2001). 
47. Dowthitt, 931 S.W.2d at 251.
48. Stephensen v. State, 494 S.W.2d 900, 904 (Tex. Crim. App. 1973).
49. Id.; see also Cooks v. State, 844 S.W.2d 697, 726 (Tex. Crim. App. 1992) (applying
Stephenson test for "objectionable juror" to alleged error in jury selection procedures). 
50. See Sharp v. State, 677 S.W.2d 513, 517 (Tex. Crim. App. 1984).
51. Garrett v. State, 791 S.W.2d 137, 140 (Tex. Crim. App. 1990) (holding that because parolees
are not afforded the same rights as persons merely suspected of committing crime, arrest is valid pursuant
to parole violation warrant where issued based on "reason to believe" defendant had violated conditions
of parole rather than probable cause). 
52. Cf. id. 
53. Flores v. State, 871 S.W.2d 714, 719 (Tex. Crim. App. 1993) (stating when legality of search
is in issue, defendant bears burden of proving that his own privacy rights were violated).
54. See Hughes v. State, 24 S.W.3d 833, 838 (Tex. Crim. App.) (holding that defendant as
passenger in car did not have standing to complain of search in absence of evidence showing possessory
interest or reasonable expectation of privacy); Flores, 871 S.W.2d at 719-20 (holding that defendant failed
to establish standing in vehicle registered to his mother where there was no evidence defendant had interest
in or right to use car).
55. Welch v. State, 93 S.W.3d 50, 52 (Tex. Crim. App. 2002). 
56. Id.
57. See Frazier v. Cupp, 394 U.S. 731, 740 (1969) (holding officers could seize personal effects
of defendant which were found in a duffle bag defendant shared with third person and which were evidence
of a crime when third person gave valid consent to search bag). 
58. Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999); Garcia v. State, 887 S.W.2d
846, 859 (Tex. Crim. App. 1994). 
59. Huddleston v. State, 661 S.W.2d 111 (Tex. Crim. App. 1983) (concluding that carrying knife
with 3-inch blade was sufficient to show threat of deadly force under kidnaping provision); Michael v.
State, 834 S.W.2d 64, 67-68 (Tex. App.-Dallas 1992) (holding threat with shotgun rendered defendant
criminally responsible as party for aggravated robbery).
60. See Tex. Pen. Code § 1.07(a)(9) ("coercion" defined in Penal Code as "threat, however
communicated"); see also Whiteside v. State, 29 S.W.2d 399, 401-403 (Tex. Crim. App. 1930) (op.
on reh'g) (recognizing homicide may be committed pursuant to threats and intimidation and gestures where
they cause victim to be so terrorized that she leapt from window).
61. Venirepersons may decide for themselves what evidence would amount to a finding beyond a
reasonable doubt of future dangerousness. See Garrett v. State, 851 S.W.2d 853, 859 (Tex. Crim.
App. 1993). 
62. Garrett, 851 S.W.2d at 859. 
63. Tex. Gov't Code § 62.110(c).
64. See, e.g., Ott v. State, 627 S.W.2d 218, 225-28 (Tex. App. - 1981, pet. ref'd) (trial judge
had discretion to excuse fourteen prospective jurors because of business scheduling conflicts; noting that
"[w]hile jury service is vital and essential, .. some people called for jury service on relatively short notice,
simply have insurmountable problems in serving in a particular week that must be recognized by the trial
judge").
65. See White v. State, 591 S.W.2d 851, 857 (Tex. Crim. App. 1979) (concluding that job-related
excuses offered by five prospective jurors were not for "economic reasons" in absence of showing that jury
service for these individuals would have resulted in loss of job, loss of compensation, salaries, wages,
suffering of financial burden, or other economic consequences), overruled on other grounds, Bigby v.
State, 892 S.W.2d 864 (Tex. Crim. App. 1994). 
66. Moore v. State, 999 S.W.2d 385, 408 (Tex. Crim. App. 1999); Pondexter v. State, 942
S.W.2d 577, 587 (Tex. Crim. App. 1996).
67. 532 U.S. 782 (2001). We refer to the Court's opinion as "Penry II" to avoid confusing it with
the Court's earlier opinion in Penry v. Lynaugh, 492 U.S. 302 (1989).
68. 530 U.S. 466 (2000).